## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STANLEY SUMMERVILLE,**<br>**FOMBAH SIRLEAF,**<br><br>                    **Plaintiffs,**<br><br>        **v.**<br><br>**DETECTIVE SERGEANT M. GREGORY,**<br>***et al.,***<br><br>                    **Defendants.** | No. 14-cv-7653 (KM)(MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

This constitutional tort action under 42 U.S.C. § 1983 arises from an allegedly unconstitutional detention of the plaintiffs, Stanley Summerville and Fombah Sirleaf, by several New Jersey State Troopers. Plaintiffs allege that the officers confronted and detained them without reasonable suspicion, in violation of their Fourth Amendment rights, and on the basis of racial profiling. As a result of apt concessions by the plaintiffs, I focus here on the claims against Detective Michael Gregory, the officer in command of the operation, and to some extent Det. Sgt. P. Ciano.[1]

---

[1]     At oral argument, counsel for the plaintiffs conceded that they lacked an evidentiary basis to pursue their claims against those subordinate officers, with the exception of P. Ciano. (Transcript of oral argument, Aug. 22, 2019 ("Tr.") 47:5–8, 47:20–48:12) The claims against J. Gauthier, J. Harrison, E. Bobal, T. Kelshaw, R. Joaquin, and P. Chariamonte are therefore dismissed. The liability of Det. Sgt. Ciano was argued primarily in connection with qualified immunity, so I discuss it there. *See* Section III.C, *infra.*

Also named as a defendant, on supervisory or vicarious liability grounds, was the then-Superintendent of the New Jersey State Police, Col. Joseph R. Fuentes (DE 33). On March 11, 2016, I issued an Opinion and Order denying Col. Fuentes's motion to dismiss because plaintiffs had adequately stated a claim against him pursuant to *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018 (1978). (DE 51). Plaintiffs have expressly abandoned their claim for supervisory

The police have a difficult job. When they make on-the-spot decisions they do not, like a judge reviewing the matter, have the benefit of leisure, legal research, and hindsight. The reasonable-suspicion standard and qualified immunity thus give the police a certain amount of leeway to investigate facts, falling short of probable cause to arrest, that may (as here) turn out to be wholly innocuous. Anyone who has ever surfed the internet can understand how a simple search for information, initially intended to be brief, can stretch into 30, 60, or 90 minutes. Still, I must conclude that the detention here, even assuming it was based on reasonable suspicion (which remains a contested factual issue), was too long and severe an intrusion on the privacy and dignity of these two innocent persons.

Now before the Court are the defendants' motion for summary judgment (DE 114) and plaintiffs' cross motion for summary judgment (DE 117). For the reasons described below, I will grant in part and deny in part both sides' motions.[2]

## I.    BACKGROUND

### A. Procedural History

Plaintiffs filed their initial complaint on December 9, 2014, naming the New Jersey State Police, New Jersey State Trooper John Does 1-10, Universal

---

liability against Col. Fuentes, however. (*See* Pl. Br. at 9). I will therefore dismiss Col. Fuentes from the case.

[2]    Record items will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated.

| | |
|---|---|
| "DE __" = | Docket Entry in this case |
| "Comp." = | Third Amended Complaint (DE 33) |
| "Video" = | October 8, 2014 Surveillance Video of Jersey Gardens Mall Parking Lot (DE 117-5 at 19) |
| "Def. Br." = | Defendants' Brief in Support of their Motion for Summary Judgment (DE 114-1) |
| "Pl. Br." = | Plaintiffs' Brief in Opposition to Defendants' Summary Judgment Motion and in Support of Plaintiffs' Cross-Motion for Summary Judgment (DE 117) |

Protection Service, and JG Elizabeth LLC. (DE 1). On February 18, 2015, plaintiffs filed their first amended complaint, adding the (now former) Superintendent of the New Jersey State Police, Col. Joseph R. Fuentes, and removing as defendants the New Jersey State Police, Universal Protection Service, and JG Elizabeth LLC. (DE 11). After exchange of certain discovery, plaintiffs filed their second amended complaint on May 14, 2015, which replaced the John Doe State Troopers with Lieutenant J. Harrison and Detectives M. Gregory, J. Gauthier, P. Ciano, E. Bobal, T. Kelshaw, R. Joaquin, and P. Chariamonte. (DE 17).

On August 10, 2015, plaintiffs filed their third amended complaint (for purposes of this Opinion, the "Complaint," cited as "Comp. ¶ __"). (DE 33). The current Complaint asserts two § 1983 causes of action: (1) false imprisonment and false arrest (Comp. ¶¶ 84–97); and (2) racial profiling and selective enforcement. (Id. ¶¶ 130–135). Both are asserted against the individual defendant police officers only.

On January 4, 2019, all remaining defendants filed a motion for summary judgment. (DE 114). On March 1, 2019, plaintiffs filed an opposition and cross motion for summary judgment. (DE 117).

### B. Facts

Defendant Michael Gregory is a detective sergeant of the New Jersey State Police Organized Crime and Gangs Unit. Gregory oversaw the investigation of Richard Parker ("Parker"), a black male (race is relevant to the allegations), who was suspected of trafficking heroin. (DE 117-2 ¶ 6; DE 120-2 ¶ 6; DE 117-5 at 32, 37). Det. Gregory is a white male. (DE 117-2 ¶ 8; DE 120-2 ¶ 8). Det. Gregory supervised the October 8, 2014 surveillance operation of Parker and made all the pertinent decisions, including the decision to detain the plaintiffs. (DE 117-2 ¶ 12; DE 120-2 ¶ 12; DE 114-2 ¶ 31; DE 117-1 ¶ 31). The following officers assisted Det. Gregory in his surveillance of Parker:

J. Harrison, P. Ciano, E. Bobal, T. Kelshaw, J. Gauthier, R. Joaquin, and P. Chariamonte.[3] (DE 117-2 ¶ 7; DE 120-2 ¶ 7; DE 117-5 at 32).

In September 2014, Det. Gregory received information from a confidential source ("CS") that Parker was a black male in his mid-thirties who lived in Newark and was engaged in the distribution of heroin in New Jersey. (DE 117-5 at 3–9; DE 117-2 ¶ 5; DE 120-2 ¶ 5; DE 117-5 at 37). The CS also told Det. Gregory that Parker had served several years in state prison for a homicide, was on parole, frequently drove a white Lexus with a specific registration number during narcotics transactions, and often carried a handgun during those transactions. (DE 117-5 at 3, 4).

To corroborate the CS's information, Det. Gregory searched Parker's name and registration number in law enforcement databases. (DE 117-5 at 4). These corroborated that the Lexus was registered in Parker's name, that he lived in Newark, that he was in his mid-thirties, and that he was on parole from a murder sentence. (Id.). Det. Gregory showed the CS a photograph of Parker from the New Jersey Department of Motor Vehicles, which the CS identified as the person the CS had been referring to. (Id.).

Subsequently, in October 2014, Det. Gregory met with the CS to monitor a telephone conversation between the CS and Parker. During the call, the CS held the phone so that Det. Gregory could listen to the conversation. (DE 117-5 at 4). Det. Gregory heard the CS and Parker discuss the sale of heroin. (Id.). Det. Gregory certified in an affidavit that he learned from the CS that on October 8, 2014, Parker would be transporting 200 bricks of heroin to a location in Ocean County, New Jersey, for sale. (DE 114-6 at 60).[4]

---

[3]     M.D. Friedenberger also assisted in the surveillance of Parker but is not a defendant in this action. (DE 117-2 ¶ 7; DE 120-2 ¶ 7). Officers Bobal and Joaquin did not participate in the actual surveillance of Parker on October 8, 2014. (DE 117-5 at 38). They arrived at the Jersey Gardens Mall after Parker and the plaintiffs had already been detained. (Id.).

[4]     Plaintiffs contend that this certification is a "sham affidavit" and that Det. Gregory only learned that 200 bricks of heroin were involved after finding 200 bricks of heroin in Parker's vehicle on October 8, 2014. I do not regard the issue as very

Det. Gregory then used a law enforcement database to find Parker's place of employment in Elizabeth, New Jersey. (DE 117-5 at 4). On October 7, 2014, Det. Gregory and Det. Joaquin established surveillance of Parker's vehicle at that location. (*Id.;* DE 117-2 ¶ 17; DE 120-2 ¶ 17). Parker eventually got in his car and drove off, but the detectives were unable to follow him on the highway because of the traffic conditions and Parker's high rate of speed. (*Id.*).

The next day, October 8, 2014, Det. Gregory continued his surveillance of Parker with a team of seven other officers, as well as members of the Ocean County Prosecutor's Office, starting at Parker's place of employment. (DE 117-5 at 4–5, 33; DE 122-1 ¶ 5). As part of their tactical plan to follow Parker, the officers continued their surveillance of him when he left his place of employment around 3:00 P.M. and drove to his Newark apartment. (*Id.*). Around a half hour later, Parker left his apartment and drove to the Jersey Gardens shopping mall[5] in Elizabeth, New Jersey, while under constant surveillance. (*Id.*). Det. Gregory did not know in advance that Parker was heading to Jersey Gardens but followed him there with the surveillance team. (*Id.* at 33, 39).

Fombah Sirleaf is related to Liberia's then-president, Ellen Johnson Sirleaf. Fombah Sirleaf was the head of Liberia's national law enforcement organization. (*Id.* at 39; DE 117-2 ¶ 3; DE 120-2 ¶ 3). Around 2010, Sirleaf worked undercover for the U.S. Drug Enforcement Agency as part of a successful law enforcement initiative to dismantle an international drug trafficking organization that sought to route drugs through, among other countries, Liberia and the United States. (See DE 117-8 at 49–54). There is no indication, however, that the officers who detained him knew these background facts, which do not figure in the Fourth Amendment analysis.

---

material; the police had ample reason to suspect Parker of drug trafficking and to place him under surveillance that day.

[5]     The official name of the mall is The Mills at Jersey Gardens®. It is located adjacent to the New Jersey Turnpike in Elizabeth.

Plaintiffs Stanley Summerville and Fombah Sirleaf, both adult males, are lawful green-card residents of the United States. (DE 117-8 at 38, 44, 45). In October 2014, Sirleaf came to the United States from Liberia to purchase military equipment in his official capacity as a member of the Liberian government. (DE 117-8 at 39; DE 117-2 ¶ 3; DE 120-2 ¶ 3). On October 8, 2014, Sirleaf and Summerville, who are friends, were shopping together at the Jersey Gardens shopping mall. (DE 117-2 ¶¶ 2, 40–41; DE 120-2 ¶¶ 2, 40–41; DE 117-8 at 39, 44, 45). Prior to visiting the mall, Sirleaf purchased around $1,000 worth of various over-the-counter pharmaceutical items that he intended to bring back to Liberia to assist with the Ebola epidemic. (*Id.*; DE 114-6 at 62, 77).

At about 3:31 p.m., Sirleaf and Summerville purchased two suitcases from Marshalls, a store inside the mall. They then exited from the mall and walked to their car, a black Mercedes SUV, in the mall parking lot. (DE 117-8 at 39, 40, 44; DE 117-2 ¶¶ 1–4; DE 120-2 ¶¶ 1–4). There, they spent about 10 minutes rearranging their things, including the pharmaceutical items, and placing them in the two new suitcases that they had just purchased. (DE 117-8 at 40, 44). They placed the suitcases in the trunk of the car and walked back and forth between the seating areas of the car and the trunk as they rearranged the items. (*See* Video).

As plaintiffs were reorganizing the items in their luggage, Parker pulled his car into a parking spot. Parker's spot was located across a driving lane and about 30 feet down from the plaintiffs' spot. (DE 117-2 ¶¶ 46, 92; DE 120-2 ¶¶ 46, 92; Video).

Parker parked his car next to another car, a grey Mountaineer, that was already parked. (DE 117-5 at 44–45). The occupant of the Mountaineer got out and got inside Parker's car. (*Id.* at 45). That person did not communicate or make any contact with the plaintiffs. (*Id.* at 45). After entering Parker's car and remaining there for around 20 seconds, that person got out of Parker's car, got back into the Mountaineer, and drove out of the parking lot, never to be seen again. The Mountaineer driver was not detained or arrested, and the officers

did not even record the license plate number of the Mountaineer. (*Id.* at 45, 49, 52; Video at 1:45–2:45; DE 117-2 ¶ 73; DE 120-2 ¶ 73). About a minute later, Parker was arrested in the Jersey Gardens parking lot by Det. Kelshaw. (DE 117-5 at 45, 47). The officers searched Parker's vehicle and uncovered a duffel bag that contained 200 bricks of heroin and $1,400 in cash. (DE 114-2 ¶ 31; DE 117-1 ¶ 31).

Det. Gregory pulled into an adjacent area of the parking lot about 15 seconds after Parker pulled into the parking lot. (DE 117-5 at 33, 45; Video at 1:20–40). Gregory's car was located approximately 300 feet from the plaintiffs' car and 330 feet from Parker's car. (DE 117-2 ¶¶ 53, 54; DE 120-2 ¶¶ 53, 54). As Det. Gregory was surveilling Parker, Gregory could see the plaintiffs at the rear of their Mercedes SUV moving between the sides of the car and the trunk. (DE 117-5 at 40, 41). When Gregory first saw the plaintiffs standing behind their vehicle, he thought that Parker might have been going to meet them. (DE 117-2 ¶ 97; DE 120-2 ¶ 97). Gregory saw plaintiffs taking items out and putting items into their suitcases, but he did not see what the items were. (*Id.* at 44). Det. Gregory did not observe Parker communicating with the plaintiffs at all; he did not see them approach Parker or vice versa. (*Id.* at 44). Det. Gregory did not see plaintiffs using their cell phone and never saw them move away from the immediate area of their parked car. (DE 117-2 ¶¶ 60, 61; DE 120-2 ¶¶ 60, 61).

At approximately the same time that the officers detained Parker, they also stopped plaintiffs. (DE 117-5 at 47). It was Det. Gregory who made the decision to stop the plaintiffs; he ordered the other officers to do it. (*Id.* at 47). Det. Gregory drove toward the plaintiffs in his car, then got out of his car and jogged toward them with his gun drawn as he told them to show their hands. (*Id.* at 48, 54). Det. Guathier (also with his gun drawn) and Det. Chariamonte similarly approached the plaintiffs. (*Id.* at 54; DE 117-2 ¶ 110; DE 120-2 ¶ 110). The officers ordered the plaintiffs to lie down on the ground. (DE 117-5 at 48; DE 114-6 at 53–54, 106; Video). Det. Gregory frisked Sirleaf and Det.

Gauthier frisked Mr. Summerville; no weapon was found. (*Id.* at 48). Det. Gregory handcuffed Mr. Sirleaf and Det. Gauthier handcuffed Mr. Summerville. (DE 117-2 ¶ 111; DE 120-2 ¶ 111; DE 114-6 at 53–54, 106; Video). At this point, at the latest, plaintiffs obviously were not free to leave. (*Id.* at 50).

The officers then began to question the plaintiffs. (DE 117-5 at 49). According to his deposition testimony, Det. Gregory explained to Sirleaf that a drug deal had occurred directly across from them. He asked the plaintiffs whether they knew Parker, or the occupants of the other vehicles. (*Id.*; DE 114-6 at 55; DE 114-6 at 61).). The plaintiffs said that they did not. (DE 117-5 at 50). According to Mr. Sirleaf's deposition testimony, the officers repeatedly accused him of lying about whether he knew Parker and of lying to the Transportation Security Administration ("TSA") officials concerning whether he may be infected with the Ebola virus. (DE 117-8 at 41).

Mr. Summerville is a U.S. resident who was born in Liberia but had resided in the U.S. for 29 years. (DE 114-2 at 9). Mr. Summerville provided the officers with a New Jersey driver's license. (DE 114-2 at 10). Mr. Sirleaf is a U.S. resident. He told the detective that he had traveled to the United States from Liberia the day before. (DE 114-2 at 10). Mr. Sirleaf provided the officers with a Pennsylvania driver's license but did not display his passport or green card because he had left them in his hotel room. (DE 114-2 at 10; DE 114-6 at 102).

The officers and plaintiffs spoke for around 10 minutes before Det. Gregory presented Mr. Summerville with a consent to search form for his vehicle. (DE 114-6 at 62). Mr. Summerville freely consented to the search of his vehicle. (DE 114-6 at 112; DE 114-6 at 62; DE 117-8 at 41). The search took around 30 minutes. (DE 114-6 at 62). It did not yield weapons, drugs, or incriminating evidence. (DE 117-5 at 49; DE 117-2 ¶ 114; DE 120-2 ¶ 114). The vehicle search did yield the suitcases and approximately $1,000 worth of over-the-counter medications. (DE 114-6 at 62). The plaintiffs provided Det. Gregory with the receipts for these items. (*Id.*). The police continued to question the plaintiffs, who remained in handcuffs. (DE 117-8 at 41).

After the vehicle search, Detectives Gregory and Joaquin went to the mall's security office to review the surveillance video. It took about 10 minutes to get to the office from the parking area. (DE 114-2 at 11). The detectives were in the security office for approximately 10 to 15 minutes. The surveillance video confirmed that the plaintiffs were not involved in Parker's narcotics transaction. (*Id.*). The officers then removed the plaintiffs' handcuffs but did not release them. (DE 114-2 at 11). At this point, they had been in custody for about 60 minutes.

At some point, Mr. Sirleaf had stated in response to questioning that he had arrived from Liberia the day before, was director of the national law enforcement organization in Liberia, was travelling to the U.S. to look at military equipment, and had assisted U.S. law enforcement in the past. (DE 114-6 at 102). Det. Friedenberger contacted an investigator with the Joint Terrorism Task Force ("JTTF") of the Federal Bureau of Investigation "to verify [Mr. Sirleaf's] travels and what was going on" due to "Mr. Sirleaf not having any of his documents and the things that he stated to me." (*Id.*). The JTTF was able to verify Mr. Sirleaf's travels and alleviate concerns regarding possible terrorist activity, which took the JTTF investigator approximately 30 minutes to do. (*Id.*).

After a detention that lasted a total of about 90 minutes, the officers released the plaintiffs. The officers told them that a surveillance video showed that they did not have contact with Parker. (DE 117-8 at 41; DE 114-2 at 13; DE 117-2 at 36).

I have reviewed the surveillance video (there is no audio). It shows plaintiffs in the mall parking lot maneuvering items in the trunk and walking between the doors of their black Mercedes SUV and the back of the car. (*See* Video). The surveillance video (or at least the usable, excerpted portion) is approximately 4 minutes long. When it begins, the plaintiffs are already next to their SUV rearranging the items in their suitcases. (*Id.* at 0:01; DE 122-1 ¶ 26). The Mountaineer can already be seen parked in the parallel row of spots across from the plaintiffs. Five people walk in a group through the parking lot and get

9

into a car that is a few spots away from where the plaintiffs are standing. (Video at 0:46–1:50). Around a minute and a half into the surveillance video, Parker's white Lexus can be seen entering the parking lot and pulling into the spot directly next to the Mountaineer. (*Id.* at 1:20–33). Two seconds after Parker's car enters the parking lot, Det. Gregory's undercover vehicle and another officer's vehicle (a van and a pickup truck) can be seen entering the area, *i.e.,* driving outside the periphery of the parking lot and making a left turn onto a lane that is part of the parking area and adjacent to the area where plaintiffs and Parker were located. (*Id.* at 1:20–40). From then on, Det. Gregory's vehicle cannot be seen in the video until the plaintiffs are detained.

The video shows that a few seconds after Parker pulls into his spot, a person exits the Mountaineer and enters the passenger seat of Parker's white Lexus, remains there for approximately 20 seconds, gets back into the Mountaineer, and drives out of the mall parking lot. (*Id.* at 1:38–2:45; DE 117-2 ¶ 72; DE 120-2 ¶ 72). Throughout this time, plaintiffs continue arranging items in their trunk and walking between the passenger doors and trunk of their Mercedes SUV.

About 15 seconds after the Mountaineer exits from the parking lot, Parker begins to pull his car out of his parking spot. (Video at 2:57). At this point, the surveillance camera turns away from the parking lot for about 10 seconds; all that can be seen is a tree which obstructs the view. (*Id.* at 2:59–3:12). When the camera turns back to the parking lot, Parker's white Lexus is out of its spot and waiting behind another vehicle. (*Id.* at 3:13). The plaintiffs are still consolidating the items in the trunk of their car. The camera again turns away from the parking lot, this time for approximately 25 seconds. (*Id.* at 3:20–45).

When the camera turns back to the relevant area, Summerville can be seen with his hands in the air as an officer points a gun at him. (Video at 3:45–50). Two undercover police cars pull up to the plaintiffs' vehicle and three officers can be seen detaining Summerville. Sirleaf is out of view of the camera

10

because he is on the far side of the Mercedes SUV, but Summerville can be seen getting down on the ground as the officers detain him. Parker can also be seen being detained near his white Lexus. (*Id.* at 3:51–55).

Overall, the officers detained the plaintiffs for approximately 90 minutes, and they were handcuffed for about 60 minutes of that period. (DE 117-2 ¶ 117; DE 120-2 ¶ 117). Sirleaf at least concededly was not free to leave during the entire period.[6] (*Id.*). The plaintiffs assert that they suffered physical and emotional discomfort during this time. Neither plaintiff was treated by any kind of medical professional as a result of the detention. (DE 117-2 ¶¶ 118–20; DE 120-2 ¶¶ 118–20; DE 114-2 ¶¶ 67, 68; DE 117-1 ¶ 67, 68). The officers did not stop any other person besides the plaintiffs and Parker during the October 8, 2014 incident. (DE 117-5 at 51).

Plaintiffs claim that there were white shoppers in the mall parking lot. (DE 117-2 ¶ 121; DE 120-2 ¶ 121). Specifically, Sirleaf certifies that during the 10-minute period in which the plaintiffs were loading items into their suitcases, there was a white shopper parked next to their vehicle loading purchases into his vehicle. This, he says, occurred minutes before the officers detained the plaintiffs. (DE 117-8 at 40 ¶ 17). In the surveillance video, however, no white shoppers can be seen. From the time that Parker pulled into the parking lot, the video shows no white shopper loading items into a car near the plaintiffs. (*See* Video). Sirleaf states that he also saw white shoppers at the time he was handcuffed. (DE 114-6 at 92, 94). The plaintiffs do not report hearing the officers utter any racial slurs. (*Id.* at 95).

Det. Gregory stated during his deposition that he suspected there might have been countersurveillance or lookouts in the area of what he believed to be a drug transaction. In addition, he said, he suspected there could be someone

---

[6] For the last 30 minutes, while the officers were checking Sirleaf's immigration status, Summerville was not physically restrained. His counsel stated at oral argument, however, that he could not have driven away without leaving his friend behind. Whether Summerville was free to leave during the last 30 minutes presents a disputed issue of fact.

else in the area to whom additional drugs or money would be delivered. (DE 117-5 at 49). According to Det. Gregory, those suspicions were based on the totality of information that he had acquired about Parker, such as the large quantity of narcotics and sum of money that could have been in play, as well as his background knowledge about these types of operations. (*Id.* at 49). Det. Gregory "wanted to detain Mr. Summerville and Sirleaf temporarily to ascertain if they were involved or not" in Parker's drug dealing. (*Id.* at 49). He initially thought that Parker was going to meet the plaintiffs when Parker pulled into the parking lot. (DE 117-5 at 44).

Det. Gregory did not know who the plaintiffs were, but his suspicions became aroused when Parker "happened to pull [his car] directly across" from the plaintiffs. (*Id.* at 56). At the time he ordered the plaintiffs to be stopped, he had not ruled out the possibility that they had communicated with Parker through a cellphone or with hand signals. (*Id.* at 59). He had not seen this, however. According to Det. Gregory's deposition, race did not play any part in his suspicions, and he would have stopped white persons parked across from Parker whose actions were similar to those of plaintiffs. (*Id.* at 56).

Det. Gregory wrote a New Jersey Police Investigative Report dated November 24, 2014[7] (the "Report") to memorialize this incident. (DE 117-5 at 3–9). That Report largely tracks the facts outlined above.[8] One potential inaccuracy within the Report that plaintiffs highlight is whether Det. Gregory was accurate when writing in the Report that it was "*after observing* the hand to hand transaction" between Parker and the person in the Mountaineer that he "requested that surveillance units initiate an investigative stop of Parker's vehicle and [the plaintiffs] to determine their involvement." (DE 117-5 at 5)

---

[7]      Although the Report is dated November 24, 2014, Det. Gregory testified that he drafted it directly after the October 8 incident. (DE 117-5 at 50).

[8]      Det. Gregory corrected one error in the Report during his deposition testimony. He inaccurately wrote in the Report that Parker arrived in the parking lot before the Mountaineer arrived. (DE 117-5 at 45). When Parker pulled into the parking lot, the Mountaineer was already parked there. (*Id.*; *see* Video).

(emphasis added). Plaintiffs assert that the officers did not view the "hand to hand transaction" in person but instead only learned of it afterward, when reviewing the surveillance video. Det. Gregory's deposition testimony on this point is equivocal. (*See* DE 117-5 at 45 ("Q: Is it fair to say that you saw what you described or what you thought was hand to hand? A: Yes. Q: Or later learned to be a hand to hand? A: Yes."); *but see* DE 117-5 at 49 (111:7–14)).

Det. Sgt. Ciano, contradicting Det. Gregory, testified that the officers first learned that there was a hand to hand transaction between Parker and the person in the Mountaineer when they reviewed the surveillance video, *i.e.*, after the officers had already detained the plaintiffs. (DE 117-2 ¶ 77; DE 120-2 ¶ 77; DE 117-6 at 11). Specifically, Det. Sgt. Ciano testified that the officers "didn't know [that Parker engaged in any transaction with the person in the Mountaineer] until after reviewing the surveillance video." It was when reviewing the video, he said, that "they noticed the hand to hand [between the person in the Mountaineer and Parker] and that [the plaintiffs] weren't involved." (DE 117-6 at 11 (34:15–35:14 ("Nobody knew whether your Plaintiffs were involved or not. That's why I said go see, go view [the surveillance video to] see what happened."))). This, said Ciano, was why there was no communication among the officers regarding the person in the Mountaineer: they did not realize Parker's interaction with the Mountaineer driver had occurred. (*Id.* ("Q: Is there any communications [between the officers] regarding the person that Parker was alleged to have conducted a hand to hand narcotics transaction? A: No, because we didn't know that until after reviewing the surveillance video.").

Det. Sgt. Ciano's testimony, then, is to some degree inconsistent with Det. Gregory's testimony and Report. (DE 120-2 ¶ 79).

Officers Ciano, Harrison, Friedenberger, and Kelshaw did not see any conduct related to the plaintiffs prior to the plaintiffs' detention. (DE 117-2 ¶¶ 68, 69; DE 120-2 ¶¶ 68, 69). When Detectives Joaquin and Bobal arrived at the mall, the other officers had already detained the plaintiffs. (DE 117-2 ¶ 70; DE 120-2 ¶ 70). Det. Gauthier did not see the plaintiffs engage in any criminal behavior or do anything suspicious. (DE 117-7 at 30, 33; DE 117-2 ¶ 63; DE

13

120-2 ¶ 63). State Police Col. Fuentes, who was not present, had no knowledge or involvement with the events that transpired between the officers, the plaintiffs, and Parker on October 8, 2014. (DE 114-2 ¶ 77; DE 117-1 ¶ 77).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

Section 1983 does not create a substantive right but instead provides a remedy for the violation of rights created by federal law. 42 U.S.C. § 1983; *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S. Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). A prima facie case under § 1983 requires a plaintiff to demonstrate that: (1) a person deprived him or her of a federal right; and (2) the person who deprived him or her of that right acted under color of state law. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S. Ct. 1920, 1923 (1980)). There is no question here that

the defendants were acting under color of state law; they are police officers who were acting in the course of their official investigatory duties.

## A. False Arrest / False Imprisonment
### 1. The Fourth Amendment and *Terry*

The torts of false arrest and false imprisonment, in their constitutional guise under § 1983, require a detention that did not comply with the standards of the Fourth Amendment.[9] The Fourth Amendment, which is made applicable to the states by the Fourteenth Amendment, guards against, *inter alia*, unreasonable seizures of the person:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[9] "False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388, 127 S. Ct. 1091, 1095 (2007); *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 926 (2017); *see also* D. Dobbs, *The Law of Torts* § 36, at 67 (2000) ("False arrest is a term that describes the setting for false imprisonment when it is committed by an officer or by one who claims the power to make an arrest."). Each of these common law torts has a constitutional analogue which may be asserted in a § 1983 action.

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995); *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)). A purported investigative stop may develop into an impermissible *de facto* arrest, and "[i]n certain circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a de facto arrest, which must be supported by probable cause." *United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

The constitutional tort of false imprisonment "is also grounded in the Fourth Amendment's prohibition against unreasonable seizures." *Leith v. Middlesex & Somerset Cty. Prosecutor's*, No. 15-cv-7227 (FLW), 2016 WL 3647995, at *8 (D.N.J. July 8, 2016) (citing *Groman*, 47 F.3d at 636). "Notably, a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest refers only to the period of incarceration lasting from the moment of arrest until the first legal action, *e.g.*, an arraignment . . . ." *Id.*

U.S. Const., amend. IV. Quintessentially, the Fourth Amendment prohibits arrests made without probable cause. *See James v. City of Wilkes–Barre*, 700 F.3d 675, 680 (3d Cir. 2012). In general, a formal arrest, or a seizure amounting to an arrest, "must be effectuated with a warrant based on probable cause." *Johnson*, 592 F.3d at 447 (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)); *Peterson v. Attorney Gen. Pennsylvania*, 551 F. App'x 626, 629 (3d Cir. 2014) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." (internal citation and quotation omitted)). Here, there was no formal arrest of the plaintiffs, and no one argues that this detention met the probable-cause requirements for an arrest.

A lesser level of Fourth Amendment protection—the requirement of "reasonable suspicion"—extends to brief investigative detentions, known as *Terry* stops, that fall short of traditional arrests. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002); *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010). Under the "well-established exception to the warrant requirement" set forth in *Terry*, "'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Id.* (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S. Ct. 673 (2000)). The "reasonable suspicion" standard governing a *Terry* stop is less exacting than the probable cause standard governing an arrest, both in terms of the "quantity or content" and reliability of the information required. *Alabama v. White*, 496 U.S. 325, 330 (1990); *see also Arvizu*, 534 U.S. at 273–74 ("Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, . . . the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." (internal citations and quotations omitted)).

Under the reasonable suspicion standard, "the police officer must be able to point to specific and articulable facts which, taken together with rational

inferences from those facts, reasonably warrant intrusion." *Terry*, 392 U.S. at 21. "A *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *United States v. Johnson*, 592 F.3d 442, 451 (3d Cir. 2010). Thus, the lawfulness of a *Terry* stop under the Fourth Amendment requires a dual analysis: first, the court "examine[s] 'whether the officer's action was justified at its inception'—that is, whether the stop was supported by reasonable suspicion at the outset"; second, the court "determine[s] whether the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Johnson*, 592 F.3d at 452 (quoting *Terry*, 392 U.S. at 19–20).

Here, the parties agree that the plaintiffs were "seized" for Fourth Amendment purposes.[10] The parties also agree that the plaintiffs' detention is properly analyzed as an investigative *Terry* stop. (Pl. Br. at 7, 26–27, 41). They differ, however, as to whether the detention was supported by reasonable suspicion and, even if so, whether it exceeded the permissible bounds of such a stop.

### 2. Reasonable suspicion

The initial question, then, is whether the officers possessed reasonable suspicion of criminal activity at the outset that was sufficient to justify a *Terry* stop of Mr. Sirleaf and Mr. Summerville. As to this narrow issue, I find that triable issues of fact preclude summary judgment.

Part of the reasonable-suspicion basis for detaining the plaintiffs, according to Det. Gregory, was the highly suspicious interaction between

---

[10]     A "seizure" of the person has a particular meaning under the Fourth Amendment. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *United States v. Frost*, 999 F.2d 737, 740 (3d Cir. 1993) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980)). The defendants do not deny that the plaintiffs here were "seized" (Def. Br. at 21), and the concession is apt. Plaintiffs were detained by several officers at gunpoint, they submitted to authority, they were handcuffed, and they remained in custody for 90 minutes.

Parker and the person in the Mountaineer. The surveillance video clearly shows the person in the Mountaineer enter Parker's Lexus, remain there briefly, then leave in a fashion that would be suggestive of a potential drug transaction under the circumstances (*i.e.*, with the benefit of the corroborated information from the CS). Following the parties, I will make the defendant-favorable inference that this was a hand-to-hand drug transaction between Parker and the Mountaineer driver, and designate it as such.

I set aside for a moment the issue of whether a transaction between Parker and the Mountaineer driver would cast suspicion on the plaintiffs at all, and first consider an antecedent issue of timing. Reasonable suspicion "is measured before the search; information acquired subsequent to the initial seizure cannot retroactively justify a *Terry* stop." *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006) (collecting cases). Understanding what Det. Gregory knew at the time he ordered the plaintiffs' detention, then, is critical to an evaluation of the reasonableness of the initial justification for the seizure. *Terry*, 392 U.S. at 21–22 ("[I]t is imperative that the facts be judged against an objective standard: would the facts *available to the officer at the moment of the seizure*. . . warrant a [person] of reasonable caution in the belief that the action taken was appropriate?") (emphasis added); *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) ("Information acquired after the initial seizure is not relevant to the reasonable suspicion analysis.").

According to Det. Gregory's motion papers, he had seen the hand-to-hand drug transaction at the time he ordered both Parker and the plaintiffs detained. The basis for the detention of Mr. Sirleaf and Mr. Summerville was Det. Gregory's belief that they had played some role in that transaction, perhaps as lookouts. A key factual issue, then, is whether Det. Gregory was aware of the hand-to-hand transaction between Parker and the Mountaineer driver *in real time, i.e.,* when that interaction occurred, or whether he learned of it only later, after plaintiffs had been detained, when he viewed the surveillance video.

The evidence conflicts as to whether Det. Gregory actually witnessed the Mountaineer hand-to-hand transaction before making the decision to detain the plaintiffs. As to this issue, Det. Gregory's deposition testimony is equivocal. (*See* DE 117-5 at 45 ("Q: Is it fair to say that you saw what you described or what you thought was hand to hand [between Parker and the person in the Mountaineer]? A: Yes. Q: Or later learned to be a hand to hand? A: Yes."); *but see* DE 117-5 at 49 (111:7–14)). Det. Gregory's police investigative Report, however, stated plainly that it was "*after observing* the hand to hand transaction" between Parker and the person in the Mountaineer that Det. Gregory "requested that surveillance units initiate an investigative stop of Parker's vehicle and [the plaintiffs] to determine their involvement." (DE 117-5 at 5) (emphasis added).

There is much evidence that a competent cross-examiner could use to cast doubt on this account. First, and most glaringly, the police did not stop the Mountaineer from leaving the lot or attempt to arrest the Mountaineer driver. Rather, Det. Gregory ordered the team to sweep in and detain the plaintiffs (and Parker, of course). If Det. Gregory or the other officers had witnessed the hand-to-hand transaction, their failure to pursue or detain the Mountaineer driver—or even record the Mountaineer's license plate number—would be inexplicable.

Det. Sgt. Ciano's testimony, too, contradicts Det. Gregory's account. Ciano testified that Det. Gregory and the other officers first learned that there was a hand-to-hand transaction between Parker and the person in the Mountaineer only later, upon reviewing the surveillance video. (DE 117-2 ¶ 77; DE 120-2 ¶ 77; DE 117-6 at 11). As Det. Sgt. Ciano remembered it, the officers "didn't know [about the Mountaineer hand-to-hand] until after reviewing the surveillance video" and that the review of the surveillance video was "when they noticed the hand to hand [between the Mountaineer driver and Parker] and that [the plaintiffs] weren't involved." (DE 117-6 at 11 (34:15–35:14)). Indeed, the officers' inability to determine whether the plaintiffs were involved was the

motivation for checking the surveillance video. (*See id.* ("Nobody knew whether your Plaintiffs were involved or not. That's why I said go see, go view [the surveillance video to] see what happened.")). According to Det. Sgt. Ciano, there was no communication whatever among the officers regarding the person in the Mountaineer until they reviewed the video. (*Id.* ("Q: Is there any communications [between the officers] regarding the person that Parker was alleged to have conducted a hand to hand narcotics transaction? A: No, because we didn't know that until after reviewing the surveillance video.")).

The resolution of this factual question regarding timing is relevant to the issue of whether Det. Gregory's initial order to detain the plaintiffs was based on anything more than a "mere hunch." *Arvizu*, 534 U.S. at 274 (quoting *Terry*, 392 U.S. at 27) ("[A]n officer's reliance on a 'mere hunch' is insufficient to justify a stop"). If Det. Gregory did not see or learn about the hand-to-hand transaction with the Mountaineer driver, he could not have based his suspicions about the plaintiffs on their perceived relation to that hand-to-hand transaction. His suspicions about the plaintiffs would then have been based on no more than their proximity to Parker's vehicle in a public parking lot and reshuffling of their luggage. *See United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) ("The Supreme Court has never viewed *Terry* as a general license to detain everyone within arm's reach of the individual whose conduct gives rise to reasonable suspicion."); *see also Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 342 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").[11]

Reasonable suspicion is a fact-sensitive determination and will often depend on development of all the facts and resolution of all factual disputes. *See Goodrich*, 450 F.3d at 558 ("As the initial stop, and nothing else,

---

[11]    "Although the Court in *Ybarra* was discussing probable cause to arrest rather than the reasonable suspicion for a stop under *Terry,* the Court's pronouncement is equally applicable to this situation." *Navedo*, 694 F.3d at 469.

21

constitutes the alleged constitutional violation, the facts and circumstances known to the troopers *preceding* the vehicle stop acquire particular salience."); *Arvizu*, 534 U.S. at 266 ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.") (internal citation and quotation omitted).

There is evidence from which a fact finder could conclude that the officers missed the interaction with the Mountaineer driver, believed that Parker must have been there to meet *someone*, and fastened their suspicions on the plaintiffs. Still, on summary judgment I sit to identify issues of fact, not resolve them. It is also possible that a fact finder could believe Det. Gregory's statement that he witnessed the hand-to-hand at the time. If so, then it is somewhat easier to construct a factual mosaic in which it was permissible to detain the plaintiffs briefly to determine whether they were acting as lookouts for that drug transaction.

Plaintiffs posit that Det. Gregory intentionally distorted the facts, using hindsight to bolster his basis for detaining the plaintiffs. Even assuming that the Report is incorrect, however, deliberate falsehood is not the only possible interpretation. Det. Gregory wrote the Report after having learned all the facts; some combination of confirmation bias and simple mistake could explain his error (if error it was) as to when it was that he learned each fact.

The timing issue aside, I consider Det. Gregory's Report at face value. At best, it suggests some basis for a brief detention of the plaintiffs. Det. Gregory surmised that the plaintiffs were lookouts or in some other way involved with Parker because they were rearranging items in their trunk in relative proximity to the hand-to-hand transaction. I am wary of such reasoning, which might equally support a finding of reasonable suspicion as to any nearby shopper loading his or her purchases in a car. That would be an impermissibly broad reading of Fourth Amendment jurisprudence. *See Navedo*, 694 F.3d at 468;

*Reid v. Georgia*, 448 U.S. 438, 441, 100 S. Ct. 2752, 2754 (1980); *Ybarra*, 444 U.S. at 91; *Terry*, 392 U.S. at 27.

Det. Gregory testified that when he was *initially* driving by the parking area, he already thought that Parker was driving to meet the plaintiffs there. That inference, however, is not supported by observations. He had seen no more than the plaintiffs' loading and rearranging their mall purchases in the parking lot of the mall.

Concededly, however, the plaintiffs were doing a little more than simply loading their purchases in the car; an experienced officer might have suspected that the back-and-forth with the luggage was a bit of stage business contrived to justify the continued presence of a lookout for a drug deal. Det. Gregory claims that his background knowledge and expertise in these types of operations contributed to his suspicion of the plaintiffs. While it is true that officers can draw on their own experience and specialized training in making inferences, *Arvizu*, 534 U.S. at 273, those inferences must be reasonable. Det. Gregory still must be able to point to "some objective manifestation that [the plaintiffs were] or [were] about to be, engaged in criminal activity." *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (internal citations and quotations omitted). Here, I am willing to indulge a presumption that an experienced officer, considering the totality of the circumstances, might consider the plaintiffs' conduct a little unusual and decide to investigate further.

On this motion, I interpret the facts in the light most favorable to the police defendants. I find it possible that a juror could accept Det. Gregory's version, and therefore I deny both sides' summary judgment motions on the threshold issue of reasonable suspicion.

### 3. Scope of the detention

I move to the second prong of the dual *Terry* analysis—whether, assuming that reasonable suspicion existed, the officers' conduct was "reasonably related in scope to the initial justification for the stop and the officers' legitimate concerns for the safety of themselves and the general

public." *Johnson*, 592 F.3d at 452. To put it another way, this prong asks whether this remained within the bounds of a limited investigative stop, or whether it turned into a *de facto* arrest without probable cause.

The scope of a *Terry* stop must be limited and must involve the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. Typically, it should not approach the conditions of an arrest. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983) ("In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest."); *id.* at 510–11 (Brennan, J., concurring) ("The scope of a *Terry*-type investigative stop and any attendant search must be extremely limited or the *Terry* exception would swallow the general rule that Fourth Amendment seizures and searches are reasonable only if based on probable cause. . . . [A]ny suggestion that the *Terry* reasonable suspicion standard justifies anything but the briefest of detentions or the most limited of searches finds no support in the *Terry* line of cases.") (internal citation and quotations omitted); *United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 2645 (1983) ("[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion.").

When evaluating whether a *Terry* stop is minimally intrusive, courts consider the duration of the stop, the law enforcement purposes justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and the alternative means that the police could have used to achieve their end. *United States v. Leal*, 235 F. App'x 937, 941 (3d Cir. 2007). Thus, although duration is a critical factor, reasonableness is not solely a question of duration. The Third Circuit has held, for example, that the "'use of guns and handcuffs must be justified by the circumstances' that authorize an

investigative detention in the first place." *Johnson*, 592 F.3d at 452–53 (quoting *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995)).

In this case, the officers detained the plaintiffs for around 90 minutes. Absent some unusual circumstances, that is simply too long for a *Terry* investigative stop. Classically, an investigative stop consists of a few brief questions, plus, if justified, a patdown for weapons. I do not say that it cannot exceed those bounds, but the facts of *Terry* are relevant to its meaning.

*United States v. Place, supra,* is highly instructive. There, the U.S. Supreme Court considered the stop of an air traveler based on reasonable suspicion that his luggage contained narcotics. The officers transported the luggage to another airport where, 90 minutes after the initial seizure, a trained dog alerted the officers to the presence of narcotics. That dog alert, not itself a Fourth Amendment search, provided probable cause for the issuance of a search warrant.[12] Drugs were found in the suitcase, the traveler was charged criminally, and he moved to suppress the evidence. The Supreme Court held that this detention, with reasonable suspicion but without probable cause, exceeded the permissible limits of a *Terry* stop, and upheld the Court of Appeals' reversal of the trial court's denial of the motion to suppress.

The Court in *Place* accepted that the officers' observations would have permitted a brief investigative stop (which could have included a dog sniff if a trained dog had been available). While declining to announce a rigid time limit, the Court observed that the "brevity" of a stop is critical to the *Terry* analysis. It held that "although we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts

---

[12]     Interestingly, it does not appear that the officers actually detained the traveler himself—although he could not have left unless he was willing to do so without his luggage. The Court, however, held that a seizure and detention of luggage, no less than a seizure of the person, was subject to a *Terry* analysis. 462 U.S. at 709–10. It is not necessary to explore the implications for Mr. Summerville's claim that, even at the 60-minute mark, he could not have driven away without leaving behind his friend, Mr. Sirleaf, who was his passenger.

presented by this case." 462 U.S. at 709–10. Indeed, *Place* held that under those circumstances *"[t]he length of the detention of respondent's luggage alone* preclude[d] the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709 (emphasis added). It added that the officers' lack of diligence and their failure to tell the traveler where they were taking the luggage, or how or when it would be returned, were aggravating factors. *Id.* at 709–10.[13]

Compare the circumstances here. The plaintiffs themselves—not their suitcases—were detained for a full 90 minutes. Critically, neither the conditions of the detention nor the diligence of the officers mitigates that critical duration factor; indeed, the surrounding circumstances are aggravating.

For two thirds of that period the plaintiffs were held under conditions indistinguishable from a forcible arrest. The police swarmed on the plaintiffs with guns drawn. The plaintiffs were put down on the pavement, and they were handcuffed. For a half hour, the officers questioned the plaintiffs, but nothing about the answers was incriminating. Indeed, the plaintiffs reasonably accounted for their presence and their actions. Summerville freely gave consent

---

[13]    A relevant comparison is *United States v. Frost*, 999 F.2d 737, 741 (3d Cir. 1993), in which the Third Circuit distinguished *Place* based on other countervailing facts. There, the agents approached the suspect without drawing weapons. The court found that this was voluntary questioning, not a seizure, and found that he was told he did not need to comply with the agents' requests. At some point, however, he was asked to come to the police office. The agents observed that the suspect had bulges in his pockets and engaged in countersurveillance; acted nervous; possessed a large amount of cash; gave conflicting explanations; switched off his pager, thus erasing the history; and denied knowledge of how his suitcase came to have a padlock. A telephone check revealed a prior felony marijuana conviction. The agents told him that he was free to go, but they were summoning a drug-sniffing dog. The suspect did leave, but it took some time for the dog to arrive. In all, the luggage was in the agents' custody for about 80 minutes before the dog showed a positive alert to the stash. Perhaps the largest factor distinguishing *Frost* from *Place* was the agents' diligence. The agents had no advance warning of the suspect's presence and they summoned the drug-sniffing dog because the suspect refused to consent to a search of his luggage. No drug sniffing unit was on duty, however. In the meantime, the agents gave Frost a receipt with instructions about how to retrieve his luggage.

to search the vehicle; the search yielded nothing. The plaintiffs presented receipts for the over-the-counter pharmaceutical items, and receipts from Marshalls—a store in that very mall—for the newly purchased suitcases.

The plaintiffs remained handcuffed even after suspicions had been reasonably dispelled. At that point detention, let alone handcuffing, even if it had been justified initially, was no longer "justified by the circumstances' that authorize[d] an investigative detention in the first place." *Id.*

The officers continued to hold the plaintiffs, however, while they cast about for some sort of corroboration of what amounted to little more than an investigative hunch. Despite having had the area under actual surveillance, the officers decided to supplement their observations by reviewing the mall's surveillance camera recordings. For another half hour, they held the plaintiffs in handcuffs while they went to the mall's security office and reviewed the security camera footage. The video merely confirmed what plaintiffs had said all along—*i.e.,* that they were loading receipted purchases into their car, in the parking lot of a mall, and had nothing to do with Parker or any drug transaction. Any officer, I suppose, could prolong a detention by saying that his or her naked-eye observations needed to be checked against any surveillance cameras that might in the area. But surely such a generic, self-executing justification cannot be enough where those observations had reduced, not augmented, the basis for detention.

It didn't end there. The police, although they removed the handcuffs, then held Mr. Sirleaf, and perhaps Mr. Summerville as well, for *another* half hour while they looked for some entirely separate basis to hold Sirleaf. This additional detention was necessary, they said, so they could get telephone confirmation of Sirleaf's immigration status and travel from Liberia. (He had presented a Pennsylvania driver's license as identification, but did not have his passport or green card with him.)[14] Bear in mind that—as the State concedes—

---

[14]    Defendants argue that the information the officers learned about Sirleaf's travels from Liberia spurred their additional investigation about his immigration status. (Def. Br. at 25–30). Specifically, defendants say that because Sirleaf arrived

the suspicion of drug dealing had been entirely dispelled at this point. Mr. Sirleaf's status had reverted to that of any other shopper at the mall. The zombie presence of the officers' earlier suspicion of drug dealing cannot serve as some sort of carry-over basis to start a new, immigration-related inquiry as to a lawful resident who had presented a valid driver's license and a legitimate explanation for his conduct, but happened to have recently traveled from a foreign country. These circumstances, I find, fall short of a sufficient basis to extend the detention for yet another half hour.[15]

At oral argument, the State segmented the detention, arguing that only the first 60 minutes fall under *Terry.* The final 30 minutes, counsel stated, were a separate inquiry into Mr. Sirleaf's immigration status. I find the distinction artificial. The subject was not free to go; that the officers were pursuing different investigative avenues does not restart the clock.

The Supreme Court has disapproved this very practice of daisy-chaining lines of inquiry to extend a reasonable-suspicion stop beyond its initial justification. *See, e.g., Rodriguez v. United States*, 135 S. Ct. 1609, 1616, 191 L. Ed. 2d 492 (2015); *Illinois v. Caballes*, 543 U.S. 405, 125 S. Ct. 834 (2005) (a reasonable-suspicion traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a traffic ticket); *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009). The police had not incidentally *discovered* a problem with Mr. Sirleaf's immigration status; indeed, his statements that he has green-card status and

---

from Liberia the day before and "Liberia was suffering a wide-spread Ebola outbreak and the detectives [found] over $1,000 in over-the-counter medications in Sirleaf's suitcase," in combination with the fact that Sirleaf did not have any of his international identification on him, created an independent basis for reasonable suspicion to continue his detention. (*Id.* at 30). Purchasing medication is not a crime, or indicative of criminal behavior. Nor is being without one's green card, particularly where, as here, the person presents a Pennsylvania driver's license as identification.

[15]     There is no justification whatever, by the way, for continuing to hold Summerville, a 29-year resident of the U.S. who presented his New Jersey driver's license as identification. As noted in the Facts section, *supra*, the point at which Mr. Summerville was free to leave may present a question of fact.

his possession of a valid Pennsylvania driver's license suggested the opposite. The officers just wanted to hold him while they checked.

The police cited Mr. Sirleaf's mention of Ebola, a disease then ravaging areas of Africa, and his possession of prescription medicine which he had purchased to assist the people there. These circumstances, say the police, raised some sort of suspicion, or perhaps even suggested that Mr. Sirleaf might have had the disease.[16] None of this rises above the level of speculation.

Even on the assumption that there was reasonable suspicion in the first place, *see supra,* a reasonable jury could not find here that the officers acted diligently "to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." *Florida v. Royer,* 460 U.S. 491, 502, 103 S. Ct. 1319, 1327 (1983). The intrusion was severe, duplicating the conditions of an arrest. The officers' suspicions were not confirmed in any way by the plaintiffs' answers to their questions, their cooperation with the request for a search, the results of the search, or any other surrounding circumstances.

Finally, on the question of diligence, this record does not suggest any reason that this multi-officer team could not have checked the surveillance video or verified Sirleaf's immigration status *while* Sirleaf and Summerville were being questioned. As the State correctly points out, the test is not whether the officers pursued the most efficient course; but the officers' *diligence* in minimizing the intrusion, under *Place,* is a key factor, and it is lacking here.

The officers' decision to pursue these increasingly tenuous theories one-by-one suggests a detention in search of a basis. *Terry* does not permit this kind of bootstrapping; a detention is not permitted merely for the purpose of trying to develop the basis for a detention. *Cf. Leal,* 235 F. App'x at 940 (3d Cir.

---

[16]    This is kind of like diagnosing someone with a heart attack because he made a donation to the American Heart Association, but let that pass. There is no indication, by the way, that the officers took any precautions to avoid contracting this fatal, contagious disease from Mr. Sirleaf. Whether, as Mr. Sirleaf claims, the police accused him of lying to the customs officials about his medical condition seems to be a contested issue.

2007) ("It is clear that *Terry* does not allow police to arrest a suspect only to hold him/her until police can determine if there was probable cause to make an arrest in the first place."). Such reasoning is unconstitutionally circular: "A *Terry* stop was never intended to authorize a lengthy detention to complete an investigation that is prompted by the articulable suspicion that is the condition precedent of the intrusion allowed under *Terry*." *Id.*

For the reasons described above, the plaintiffs' motion is denied as to the issue of the initial reasonable-suspicion basis for the stop. It is granted, however, as to the excessive scope of the stop. The defendants' motion for summary judgment on this claim is wholly denied.

### B. Equal Protection/Selective Enforcement

I view the equal protection/selective enforcement claim differently. The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. . . . [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause." *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996).

Plaintiffs' equal protection claim is essentially that they were detained on October 8 primarily because they are or appear racially African or African-American. To state an equal protection claim "in the racial profiling context, a plaintiff must allege that law enforcement actions: '(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.'"[17] *See Alvin v.*

---

[17] This claim is distinct from the Fourth Amendment claim analyzed above. Plaintiffs alleging claims for racially selective detentions in violation of the Fourteenth Amendment are not required to show a lack of probable cause or reasonable suspicion. *See Nieves*, 139 S. Ct. 1715, 1731–32 (2019) (Gorsuch, J., concurring in part and dissenting in part) (citing *Hedgepeth v. Washington Metropolitan Area Transit Auth.*, 386 F. 3d 1148, 1156 (D.C. Cir. 2004) ("[S]imply because a practice passes muster under the Fourth Amendment (arrest based on probable cause) does not mean that unequal treatment with respect to that practice is consistent with equal protection.")); *see also Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety-Div. of State Police*, 411 F.3d 427, 440 (3d Cir. 2005) ("The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for

*Calabrese*, 455 F. App'x 171, 177 (3d Cir. 2011) (quoting *Bradley v. United States,* 299 F.3d 197, 205 (3d Cir. 2002)). To show discriminatory effect, a plaintiff must prove that he or she "is a member of a protected class and that [he or] she was treated differently from similarly situated individuals in an unprotected class." *See id.* (quoting *Bradley,* 299 F.3d at 206). In other words, plaintiffs' race "must have been a substantial factor" in the allegedly different treatment that they received by the defendant officers. *Hassan v. City of New York,* 804 F.3d 277, 294 (3d Cir. 2015).

Plaintiffs are clearly members of a protected racial class. *See Tucker v. Thomas Jefferson Univ.,* 484 F. App'x 710, 712 (3d Cir. 2012). Therefore, the "sole inquiry under this prong of the analysis" is whether the plaintiffs were treated "differently from similarly situated members of an unprotected class." *Bradley,* 299 F.3d at 206. Plaintiffs have not met their burden of establishing that they were treated differently from similarly situated members of an unprotected class.

Discriminatory effect "'may be proven by naming similarly situated members of an unprotected class who were not selected for the same [treatment] or, in some cases, by submitting statistical evidence of bias.'" *Calabrese,* 455 F. App'x at 177 (quoting *Bradley,* 299 F.3d at 206). Here, plaintiffs attempt to show discriminatory effect by contending that there were white shoppers present in the parking lot at the time of the October 8 incident who were not detained. (DE 117-2 ¶ 121; DE 120-2 ¶ 121).

Specifically, Sirleaf certifies that during the 10-minute period in which the plaintiffs were loading items into their suitcases, there was a white shopper parked next to their vehicle loading purchases into his vehicle in a similar manner. (DE 117-8 at 40 ¶ 17). No white shoppers can be seen in the surveillance video, which covers the critical time frame. The video establishes

---

enforcement of a law. Plaintiffs' equal protection claims under the Fourteenth Amendment require a wholly separate analysis from their claims under the Fourth Amendment.'" (quoting *Carrasca v. Pomeroy,* 313 F.3d 828, 836 (3d Cir.2002))).

that no white shoppers were loading items *during the time frame of Parker's occupying the parking space next to the Mountaineer.* (*See* Video at 1:20–4:00). Critically, that was also the precise time frame in which Det. Gregory viewed the parking lot, having arrived a few seconds after Parker. So even if the other shoppers performed acts resembling those of plaintiffs—*e.g.,* loading items into a car—those other shoppers drove away in advance of the critical events. It follows that any white shoppers, assuming they were present earlier, as described by plaintiffs, were not similarly situated with respect to suspicions that they acted as lookouts for Parker's hand-to-hand transaction with the Mountaineer driver.[18]

On this factual record, a reasonable fact finder could not conclude that the officers saw persons of other races near Parker, acting similarly, at the critical time, but nevertheless singled out the plaintiffs based on their race. The plaintiffs' attestation that white shoppers were present is their only proffered evidence of discriminatory conduct, and that is undercut by the surveillance video. *See Ference v. Twp. of Hamilton,* 538 F. Supp. 2d 785, 789, 804 (D.N.J. 2008) ("[T]he Court will not draw inferences in Plaintiff's favor that are inconsistent with the events depicted in the videotape of the incident." (citing *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007)).

As to the second prong of their racial profiling claim, the plaintiffs have not met their burden of showing that the defendants' conduct was motivated by a discriminatory purpose.[19] For example, the plaintiffs did not hear the officers

---

[18]   The surveillance video and Sirleaf's certification need not be interpreted as inconsistent or mutually exclusive. The surveillance video covers a four-minute period, whereas the plaintiffs certify that they were rearranging items in their suitcases for approximately 10 minutes. Consequently, the white shopper that Sirleaf describes as loading items into a car next to their vehicle could well have been present during the first six minutes, when plaintiffs were initially rearranging their items, but prior to the start of four-minute period captured by the surveillance video. The problem remains. The four-minute period of video surveillance encompasses the alleged hand-to-hand transaction for which the officers suspected that the plaintiffs acted as lookouts, and, importantly, the window during which the officers surveilled the parking lot.

[19]   The Court need not determine whether the defendants acted with a discriminatory purpose, having already held that the plaintiffs have not satisfied the

make any racial slurs, or otherwise evince any discriminatory animus. (DE 114-6 at 95). *See Mody v. City of Hoboken,* 959 F.2d 461, 467 (3d Cir.1992) (noting that a racial slur by police officer may be proof of racially motivated police conduct).

It is easy to understand why the plaintiffs might have projected racial prejudice onto conduct by the officers which, from plaintiffs' point of view, was simply inexplicable. And it is easy to see how the thought of racial discrimination went through Sirleaf's mind as he suffered the public indignity of sitting handcuffed on the pavement in full view of other shoppers, whether black or white. (DE 114-6 at 92, 94).

Still, although the evidence could support a finding of police overzealousness, it is not sufficient to support the additional conclusion that the officers' conduct was racially motivated. Without any further evidence of discriminatory purpose or racial singling-out, a reasonable fact finder could not find in plaintiffs' favor on their racial profiling claim.

Consequently, I will grant defendants' summary judgment motion and deny the plaintiffs' motion on this equal protection claim.

### C. Qualified Immunity

The remaining defendants are Det. Gregory and Det. Sgt. Ciano (*see* p.1 & n.1, *supra*), and the remaining claim is the Fourth Amendment claim that the detention was not justified by reasonable suspicion, or alternatively that it exceeded the scope of a reasonable-suspicion detention. As to those defendants and claims, I consider whether the doctrine of qualified immunity shields them from liability. As to Det. Gregory, the answer is no; as to Det. Sgt. Ciano, however, I hold that the answer is yes.

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar

_____

discriminatory effect element of their racial profiling claim. *See Bradley v. United States*, 299 F.3d 197, 207 (3d Cir. 2002). Nonetheless, I rule on the alternative basis that the plaintiffs have not satisfied the discriminatory purpose element.

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001). That two-part analysis inquires as to (1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679. Even if there are fact questions as to the first, constitutional-violation prong, the court is required to decide the second, *i.e.,* whether the right was clearly established. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) ("[W]hile issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established.").

When evaluating the first prong, a court must consider the facts in the light most favorable to the plaintiffs. *Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006). I have already determined (a) that there are issues of fact precluding summary judgment as to the initial, reasonable-suspicion basis for the stop; (b) that the scope of this detention violated the plaintiffs' Fourth Amendment rights; and (c) that the detention did not violate principles of equal protection.

The second prong of qualified immunity asks whether the right was so clearly established that the officer should have known that he or she was committing a constitutional violation under the circumstances. While courts are not to define clearly established law at a high level of generality, *Thompson v. Howard*, 679 F. App'x 177, 182 (3d Cir. 2017), the precise factual circumstances of a given case need not have been previously considered. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259–60 (3d Cir. 2010) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual

circumstances, as long as the law gave the defendant officer fair warning that his [or her] conduct was unconstitutional.") (internal citations and quotations omitted).

Under the circumstances of this case, it is clearly established that reasonable suspicion does not arise merely because a person is in physical proximity to someone else who is suspected of engaging in potential criminal activity. *See Ybarra*, 444 U.S. at 91; *Sibron v. New York*, 392 U.S. 40, 62, 88 S. Ct. 1889, 1902, 20 L. Ed. 2d 917 (1968); *United States v. Di Re*, 332 U.S. 581, 593, 68 S. Ct. 222, 228, 92 L. Ed. 210 (1948); *Goodrich*, 450 F.3d at 559–60 (3d Cir. 2006) ("It is well established that an officer cannot conduct a *Terry* stop simply because criminal activity is afoot." (internal citations and quotations omitted)); *United States v. Mastin*, No. 16-cr-542, 2018 WL 1005158, at *7 (M.D. Ala. Jan. 2, 2018), *report and recommendation adopted*, No. 16-CR-542, 2018 WL 1004484 (M.D. Ala. Feb. 21, 2018) ("Proximity to a wanted individual is simply insufficient to meet the reasonable suspicion standard." (collecting cases)); *United States v. McCray*, 148 F. Supp. 2d 379, 388 (D. Del. 2001) ("Observing two individuals who are possibly standing near a known loiterer, even one described as being involved in narcotics activity, without more, merely constitutes an 'inchoate and unparticularized suspicion,' and cannot justify a *Terry* stop."); *Willowby v. City of Philadelphia*, 946 F. Supp. 369, 378 (E.D. Pa. 1996) ("[A] reasonable officer would not conclude that it is constitutionally permissible to search bystanders located on a porch of a home next door to a house subject to a warranted search without something more than [the assumption that everyone in close proximity to a drug raid has a weapon].")); *see also Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014) (stating in dicta that "simply being in the presence of others who are themselves suspected of criminal activity is insufficient standing alone to establish particularized suspicion for a *Terry* stop and frisk.").

I first consider Det. Gregory's claim of qualified immunity. On one view of the contested facts—*i.e.,* that Det. Gregory did *not* observe any hand-to-hand

interaction with the Mountaineer driver—"the lack of a specific articulable suspicion should have been apparent to a reasonable officer" in Det. Gregory's position. *Couden*, 446 F.3d at 496. For the reasons stated above, however, that factual issue remains contested; it cannot be resolved in this context.

Still more apparent, however, was the need to release the plaintiffs fairly promptly once any suspicion of drug dealing was dispelled.[20] The Court in *United States v. Place,* for example, stated that it had never approved a *Terry* detention as long as 90 minutes, held that "[t]he length of the detention of respondent's luggage alone preclude[d] the conclusion that the seizure was reasonable," and suggested that a 90-minute reasonable-suspicion detention would require an extraordinary justification. *See also Illinois v. Caballes*, 543 U.S. 405, 125 S. Ct. 834 (2005) (a reasonable-suspicion traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a traffic ticket); *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009) (the seizure remains lawful and the officers may question the car's occupants, but only "so long as [unrelated] inquiries do not measurably extend the duration of the stop.").

Det. Gregory has not articulated much of a justification for continuing to hold the plaintiffs beyond the desire to conduct further investigation. That, as a matter of clear precedent, is not a sufficient basis to hold the plaintiffs in handcuffs for an hour, and then to hold them for an additional 30 minutes after that. Det. Gregory has not demonstrated that he is entitled to qualified

---

[20] Cases such as *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and *United States v. Clark*, 902 F.3d 404 (3d Cir. 2018), underscore the principle that a reasonable-suspicion traffic stop cannot extend beyond the time required to fulfill its purpose, *i.e.,* to issue a ticket for a traffic violation, unless further evidence emerges. These cases were decided after the October 2014 detention at issue in this case, so I do not rely on them for qualified immunity purposes. I note, however, that they represent a refinement, in the traffic-stop context, of a principle already well-established in the case law, *i.e.,* that the reasonableness of the scope of a detention is confined by its legitimate purpose. *See, e.g., Rodriguez,* 135 S. Ct. at 1614 (citing, *e.g., Caballes* and *Johnson, supra* in text.) Indeed, *Terry* itself required that the manner of execution of the stop be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20).

immunity at this juncture. As to the initial basis for the stop, determination would at best require resolution of contested factual issues. As to the duration and intrusiveness of the stop, I find that even on this record, qualified immunity is not appropriate.[21]

I next consider Det. Sgt. Ciano's claim of qualified immunity.

As background, I note that plaintiffs have conceded the principle that the officers under the direction of Det. Gregory generally are not liable. Those subordinate officers did not observe the critical facts on surveillance, but made the arrest because they were told to do so by Det. Gregory. (Tr. 46:23–47:24, 48:10–23)[22]

---

[21] *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (noting "the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right."); *Grant*, 98 F.3d at 122 (noting tension between the U.S. Supreme Court's "insistence that the immunity defense be decided as a matter of law" and "the reality. . . that factual issues must frequently be resolved in order to determine whether the defendant violated clearly established federal law"); *Castellani v. City of Atl. City*, No. 13-5848, 2017 WL 3112820, at *7 (D.N.J. July 21, 2017) ("Although the question of qualified immunity is generally a question of law, a genuine issue of material fact will preclude summary judgment on qualified immunity." (internal citations and quotations omitted)); *Mawson v. Pittston Police Dep't*, 145 F. Supp. 3d 363, 372 (M.D. Pa. 2015) ("Should factual disputes that are material to the qualified immunity analysis remain at the summary judgment stage, then Third Circuit precedent requires that the questions of fact go to a jury.") (collecting cases).

The defendants have not argued in particular that Det. Gregory made a reasonable mistake of fact that led him to believe that Parker engaged in a drug transaction with plaintiffs. *See Couden*, 446 F.3d at 502 (Weis, J., dissenting) (noting the "class of qualified immunity cases. . . where the issue is not whether there was a misunderstanding about the law, but rather whether the officer made a reasonable mistake of fact in carrying out his [or her] duties."). Rather, defendants argue that Det. Gregory witnessed the interaction between Parker and the person in the Mountaineer before detaining the plaintiffs and that this interaction was part of his justification for ordering the plaintiffs' detention. (*See* Def. Br. at 41–45 (cursorily citing mistake of fact doctrine but not further engaging in its application nor acknowledging what mistake, if any, was made and by whom); DE 120 at 6, 11; DE 121 at 8–19). Therefore, I do not address this "class of qualified immunity cases" regarding a reasonable mistake of fact. *Canales v. Twp. of Toms River*, No. 11-3159, 2014 WL 683991, at *16 (D.N.J. Feb. 20, 2014) ("The defendant government official bears the burden of establishing the right to qualified immunity.").

[22] Defendants Gauthier, Harrison, Ciano, Bobal, Kelshaw, Joaquin, and Chariamonte argued that they ought to be granted qualified immunity because they

37

reasonably relied on Det. Gregory's observations and obeyed his order to detain the plaintiffs. (*See* DE 121 at 6–8). It is undisputed that it was Det. Gregory who made the determination to detain the plaintiffs and directed the other officers to do so. The question, then, is not strictly one of whether reasonable suspicion existed in the abstract; as to these officers, the issue is whether they violated a clearly established right *in relying upon Det. Gregory's observations and acting on his orders* to detain the plaintiffs.

There is generally a presumption that police officers may reasonably rely upon the investigations of other law enforcement officials when requested to aid or assist in a seizure or arrest. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568, 91 S. Ct. 1031, 1037 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."); *United States v. Yusuf*, 461 F.3d 374, 385 (3d Cir. 2006) ("[I]nformation received from other law enforcement officials during the course of an investigation is generally presumed to be reliable."). A contrary rule would require that a trooper, in the paramilitary command structure of the State Police, pause and interview his or her superior before obeying an order to give chase.

Accordingly, it is well established that "the actions of a police officer acting in reliance on what proves to be the flawed conclusions of a fellow police officer may be reasonable nonetheless and thus protected by the doctrine of qualified immunity." *Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997). The law in this Circuit is clear: "where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him [or her] to believe, on the basis of the statements, that probable cause for the arrest existed." *Id.*; *see also Groman*, 47 F.3d at 635 n. 10; *Capone v. Marinelli*, 868 F.2d 102, 104 (3d Cir. 1989). The same qualified immunity analysis of probable cause would apply to questions of reasonable suspicion in the *Terry* stop context.

In this case, the plaintiffs' concession was sound. It was objectively reasonable for the defendant officers to aid Det. Gregory in detaining the plaintiffs. The officers were jointly engaging in a surveillance operation of Parker, a person suspected of distributing a large quantity of narcotics who was on parole for murder and suspected of carrying a gun. The other officers did not themselves witness what transpired between Parker and the person in the Mountaineer. They knew that Det. Gregory had been observing the events, however. Det. Gregory was leading the surveillance operation and made the determination to detain the plaintiffs and Parker. The officers had every reason to trust that his orders were based on what he had witnessed personally. In a quickly unfolding scene, with the prospect of at least one potentially armed suspect departing in his vehicle, it was reasonable for the other officers to quickly and unquestioningly respond to Det. Gregory's call for assistance. *See Rogers*, 120 F.3d at 455. The record also contains no indication that any of the defendants aside from Det. Gregory made any of the subsequent decisions to hold the plaintiffs pending further investigation.

Plaintiffs state that Det. Sgt. Ciano, however, stands on a different footing, for the following reason:

> [MR. GRAVES, Counsel for plaintiff:] But with respect to, you know, Sergeant Ciano, he may have had some indication that the plaintiffs were not suspicious and they had not been doing anything suspicious.
>
> And Ciano may have been able to have the opportunity to inform Detective Gregory that we don't have a problem with the plaintiffs; the problem is with Parker, especially if Gregory claims that he actually saw the hand-to-hand transaction.
>
> So Ciano likely can be pulled in to this violation along with Defendant Gregory.

(Tr. 47:25–48:12)

I think that Det. Sgt. Ciano, no less than the others, was entitled, and indeed obligated, to rely on and obey Det. Gregory's order to arrest and detain the plaintiffs. Ciano did not know or observe—and he knew that he did not know or observe—what Gregory saw on surveillance. Like the other officers, Ciano was justified in trusting that Det. Gregory's orders were validly based on his personal observations. No less than the others, Ciano knew the events were unfolding quickly, with Parker and potentially the other suspects poised to leave in their vehicles. It would not have been clear to a reasonable officer that furnishing rapid, unquestioning assistance would violate the constitution. *See Rogers*, 120 F.3d at 455.

The distinction drawn by plaintiffs is seemingly based on Det. Sgt. Ciano's candid, after-the-fact testimony that he did not observe the hand-to-hand transaction with the Mountaineer driver. Neither did the other officers, however; all were relying on Gregory. I add that Det. Sgt. Ciano did not make the decisions to detain or continue to hold the plaintiffs.

Accordingly, I will deny defendants' motion for summary judgment on the issue of qualified immunity as to Det. Gregory, but grant it as to Det. Sgt. Ciano.

## IV.    CONCLUSION

For the reasons stated in this Opinion, I will deny in part and grant in part defendants' motion for summary judgment (DE 114) and plaintiffs' cross motion for summary judgment (DE 117), as follows:

1(a).  Summary judgment is denied to both sides on the issue of whether there was a reasonable-suspicion basis for the initial detention of the plaintiffs.

1(b).  Summary judgment is denied to both sides on the issue of Det. Gregory's qualified immunity for the initial detention of the plaintiffs, but granted in favor of Det. Sgt. Ciano on that qualified immunity issue.

2(a).  Summary judgment is granted in favor of the plaintiffs on the issue of whether the detention exceeded the length and scope of a permissible *Terry* stop.

2(b).  Summary judgment is granted in favor of the plaintiffs denying Det. Gregory qualified immunity on the issue of whether the detention exceeded the length and scope of a permissible *Terry* stop, but granted in favor of Det. Sgt. Ciano on that qualified immunity issue.

3.  Summary judgment is granted in favor of all defendants and against plaintiffs on the claim of racially discriminatory enforcement of the laws.

4.  All claims against Col. Fuentes are dismissed with prejudice.

5.  Within five days, counsel shall jointly contact the chambers of Magistrate Judge Hammer and arrange a conference to discuss settlement of the issues remaining in the case or steps required to ready the issues for trial.

An appropriate Order follows.

Dated: August 29, 2019

HON. KEVIN MCNULTY, U.S.D.J.