UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STANLEY SUMMERVILLE, FOMBAH SIRLEAF,** | No. 14-cv-7653 (KM)(MAH) |
| **Plaintiffs,** | **OPINION** |
| v. | |
| **DETECTIVE SERGEANT M. GREGORY,** *et al.*, | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

    This constitutional tort action under 42 U.S.C. § 1983 arises from an allegedly unconstitutional detention of the plaintiffs, Stanley Summerville and Fombah Sirleaf, by several New Jersey State Troopers. Plaintiffs allege that the scope of their detention exceeded that of a permissible *Terry* stop, violating their Fourth Amendment rights. As a result of the Third Circuit's opinion on this matter, which significantly narrowed the issues in this case, I focus here on the claims against Detective Sergeant Michael Gregory, the officer in command of the operation, related to roughly the middle 30 minutes of plaintiffs' 90-minute detention.

    Now before the Court is the plaintiffs' renewed motion for summary judgment. (DE 117.) I authorized supplemental filings by both sides on the issues raised by the Third Circuit's decision. (DE 150, 151.) Defendants do not currently seek summary judgment in their favor, but argue that the case presents issues of fact that preclude summary judgment for plaintiffs and

1

require that the outstanding issues in the case be tried. I agree, and for the reasons described below, I will **DENY** plaintiffs' motion.[1]

## I. BACKGROUND

I write primarily for the parties and assume a familiarity with the underlying facts of the case. A more detailed factual background can be found in my prior opinion in this case. (DE 129.) Here, I summarize the key facts related to the remaining issues in the case.

On October 8, 2014, Detective Sergeant Michael Gregory of the New Jersey State Police led a surveillance operation of suspected heroin trafficker Richard Parker. (DE 117-5 at 33–34.) On that day, Det. Sgt. Gregory and other officers tailed Parker from his place of employment to his home in Newark, New Jersey, and then on to the Jersey Gardens shopping mall in Elizabeth New Jersey where the events relevant to this case occurred. (DE 117-5 at 4–5, 33; DE 122-1 ¶ 5.) In addition to Det. Sgt. Gregory, the following officers were present and assisted in the surveillance and investigation: Lt. J. Harrison, Detective Sergeant First Class ("DSFC") P. Ciano, Det. E. Bobal, Det. Sgt. T. Kelshaw, Det. Sgt. J. Gauthier, Det. R. Joaquin, and Det. P. Chariamonte. (DE 117-2 ¶ 7; DE 120-2 ¶ 7; DE 117-5 at 32.) Lt. Harrison was the highest-ranking officer on the scene. (DE 117-5 at 114.)

Shortly before Parker arrived at the mall, plaintiffs Summerville and Sirleaf were in the mall's open-air parking lot. They had just purchased over-the-counter medicines, and were packing their purchases into suitcases that they had also just purchased at the mall. (DE 117-4 at 22.) Both Summerville

---

[1]   Record items will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated.

| | |
|---|---|
| "DE __" = | Docket Entry in this case |
| "Video" = | October 8, 2014 Surveillance Video of Jersey Gardens Mall Parking Lot (DE 117-5 at 19) |
| "3d Cir. Op." = | Opinion in Summerville v. Fuentes, No. 19-3240, 3d Cir. September 10, 2021. |

and Sirleaf are Liberian citizens, and the medicine was intended to assist with the country's Ebola outbreak. (DE 117-2 ¶ 2, 40–41; DE 117-8 at 39, 44, 45; DE 114-6 at 62, 77.) As plaintiffs were reorganizing the items in their luggage, Parker pulled his car into a parking spot. Parker's spot was located across a driving lane and about 30 feet down from the plaintiffs' spot. (DE 117-2 ¶ 46, 92; DE 120-2 ¶ 46, 92; Video).

Parker parked his car next to another car, a grey Mountaineer, that was already parked. (DE 117-5 at 44–45; Video.) The occupant of the Mountaineer got out and got inside Parker's car. (DE 117-5 at 45). That person did not communicate or make any contact with the plaintiffs. (*Id.*) After entering Parker's car and remaining there for around 20 seconds, that person got out of Parker's car, got back into the Mountaineer, and drove out of the parking lot, never to be seen again. The Mountaineer driver was not detained or arrested, and the officers did not even record the license plate number of the Mountaineer. (*Id.* at 45, 49, 52; Video at 1:45–2:45; DE 117-2 ¶ 73; DE 120-2 ¶ 73.) About a minute later, Parker was arrested in the Jersey Gardens parking lot by Det. Sgt. Kelshaw. (DE 117-5 at 45, 47.) The officers searched Parker's vehicle and uncovered a duffel bag that contained 200 bricks of heroin and $1,400 in cash. (DE 114-2 ¶ 31; DE 117-1 ¶ 31.)

At approximately the same time that the officers detained Parker, they also stopped plaintiffs. (DE 117-5 at 47.) It was Det. Sgt. Gregory who made the decision to stop the plaintiffs; he ordered the other officers to do it. (*Id.*) Det. Sgt. Gregory drove toward the plaintiffs in his car, then got out of his car and jogged toward them with his gun drawn as he told them to show their hands. (*Id.* at 48, 54.) Det. Sgt. Gauthier (also with his gun drawn) and Det. Chariamonte similarly approached the plaintiffs. (*Id.* at 54; DE 117-2 ¶ 110; DE 120-2 ¶ 110.) The officers ordered the plaintiffs to lie down on the ground. (DE 117-5 at 48; DE 114-6 at 53–54, 106; Video.) Det. Sgt. Gregory frisked Sirleaf and Det. Sgt. Gauthier frisked Mr. Summerville; no weapon was found. (*Id.* at 48.) Det. Sgt. Gregory handcuffed Mr. Sirleaf and Det. Sgt. Gauthier

3

handcuffed Mr. Summerville. (DE 117-2 ¶ 111; DE 120-2 ¶ 111; DE 114-6 at 53–54, 106; Video). At this point, at the latest, plaintiffs obviously were not free to leave. (*Id.* at 50.)

The officers then began to question the plaintiffs. (DE 117-5 at 49.) According to his deposition testimony, Det. Sgt. Gregory explained to Sirleaf that a drug deal had occurred directly across from them. He asked the plaintiffs whether they knew Parker, or the occupants of the other vehicles. (*Id.*; DE 114-6 at 55, 61.) The plaintiffs said that they did not. (DE 117-5 at 50.) According to Mr. Sirleaf's deposition testimony, the officers repeatedly accused him of lying about whether he knew Parker and of lying to Transportation Security Administration ("TSA") officials concerning whether he may be infected with the Ebola virus. (DE 117-8 at 41.) Both Sirleaf and Summerville testified in their depositions that as soon as officers started questioning them, the officers told them not to lie because they possessed video of the events in the parking lot. (DE 117-4 at 17, 18, 54.)

The officers and plaintiffs spoke for around 10 minutes before Det. Sgt. Gregory presented Mr. Summerville with a consent to search form for his vehicle. (DE 114-6 at 62.) Mr. Summerville freely consented to the search of his vehicle. (DE 114-6 at 62, 112; DE 117-8 at 41.) It did not yield weapons, drugs, or incriminating evidence. (DE 117-5 at 49; DE 117-2 ¶ 114; DE 120-2 ¶ 114.) The vehicle search did yield the suitcases and approximately $1,000 worth of over-the-counter medications. (DE 114-6 at 62.) The plaintiffs provided Det. Sgt. Gregory with the receipts for those just-purchased items. (*Id.*) The police continued to question the plaintiffs, who remained in handcuffs. (DE 117-8 at 41.) The time elapsed at this point was approximately 30 minutes. (DE 114-6 at 62.)

After the vehicle search, Det. Sgt. Gregory and Det. Joaquin went to the mall's security office to review the surveillance video. It took about 10 minutes to get to the office from the parking area. (DE 114-2 at 11.) The detectives were in the security office for approximately 10 to 15 minutes. The surveillance video confirmed that the plaintiffs were not involved in Parker's narcotics

4

transaction. (*Id.*) The officers then removed the plaintiffs' handcuffs but still did not release them. (*Id.*) At this point, the plaintiffs had been in custody for about 60 minutes.

Then, Det. Sgt. Friedenberger contacted an investigator with the Joint Terrorism Task Force ("JTTF") of the Federal Bureau of Investigation "to verify [Mr. Sirleaf's] travels and what was going on" due to "Mr. Sirleaf not having any of his documents and the things that he stated to me." (114-6 at 102.) The JTTF was able to verify Mr. Sirleaf's travels and alleviate concerns regarding possible terrorist activity, a process that took approximately 30 minutes. (*Id.*)

After a detention that lasted a total of about 90 minutes, the officers released the plaintiffs. The officers told them that a surveillance video showed that they did not have contact with Parker. (DE 117-8 at 41; DE 114-2 at 13; DE 117-2 at 36.)

In my prior opinion, I made several related holdings. First, I denied summary judgment to both sides on the issue of whether the initial stop was supported by reasonable suspicion. I also denied summary judgment on the issue of whether Det. Sgt. Gregory was entitled to qualified immunity for the initial stop, while holding that DSFC Ciano was entitled to qualified immunity. Second, I granted summary judgment in favor of plaintiffs and held that the length and scope of the detention exceeded that of a permissible *Terry* stop. I also granted summary judgment in favor of plaintiffs denying qualified immunity to Det. Sgt. Gregory, but granted summary judgment for defendants and granted qualified immunity to DSFC Ciano. Third, I granted summary judgment in favor of defendants on the claim of racial profiling and dismissed all remaining claims against all other defendants. (DE 129 at 40.) After that opinion, defendants moved for reconsideration (DE 132.) While that motion was pending, defendants appealed this case to the Third Circuit Court of Appeals. (DE 135.) I denied the motion for reconsideration on October 31, 2019. (DE 139.) On September 10, 2021, the Third Circuit reversed in part and vacated

and remanded in part, issuing its mandate on November 24, 2021. (DE 143, 144.)

The Third Circuit's opinion gave separate analytic consideration to plaintiffs' initial detention and the three thirty-minute segments of their continued detention. The Court of Appeals ruled as follows:

- *Initial stop.* Det. Sgt. Gregory was entitled to qualified immunity for stopping the plaintiffs in the first place, based on "a reasonable, articulable suspicion to detain" the plaintiffs. This court's finding that there was an open factual issue as to whether Det. Sgt. Gregory actually "knew [at the time of the stop] that a hand-to-hand drug deal actually took place" did not preclude qualified immunity here. (3d Cir. Op. at 7.)
- *First 30 minutes.* Det. Sgt. Gregory was also entitled to qualified immunity for extending the initial stop to the extent of about thirty minutes. During that time Det. Sgt. Gregory questioned plaintiffs and searched their vehicle with reasonable diligence and without undue delay, in an effort to confirm or dispel suspicions of drug dealing. (*Id.* at 8–9.)
- *Second 30 minutes.* The Court of Appeals remanded for further consideration of whether Det. Sgt. Gregory had "personal involvement" in the decision to hold plaintiffs for an additional thirty minutes so the mall surveillance video could be reviewed. (*Id.* at 9.) The Court of Appeals found it "too cumbersome to examine Detective Gregory's personal involvement in the delayed review of the surveillance video," and opted instead to vacate and remand my decision as to this second 30-minute period: "[I]f on remand, the District Court finds that Gregory had the requisite personal involvement, it must still assess whether a reasonable officer with the information available to Gregory would have checked the video simultaneously with the questioning, and that determination may

6

depend on when information became available to Gregory." (*Id.* at 9–10.)

- *Third 30 minutes.* Det. Sgt. Gregory was entitled to qualified immunity for the final thirty minutes of the detention. After the second thirty-minute period, it was Det. Sgt. Friedenberger, not Det. Sgt. Gregory, who ordered an additional 30 minutes of detention to check plaintiffs' immigration status. Therefore, Det. Sgt. Gregory lacked the personal involvement necessary for *his* conduct to have violated clearly established law. (*Id.* at 11.)

After the case was remanded to this court, I allowed the parties to submit supplemental briefing on the issue of whether Det. Sgt. Gregory is entitled to qualified immunity for the middle 30 minutes of the stop. (DE 149.) Both parties filed their supplemental submissions on March 2, 2022. (DE 150, 151.) In their submission, Plaintiffs argue that qualified immunity should be denied and summary judgment should be granted in plaintiffs' favor. (DE 150.)

Det. Sgt. Gregory, in contrast, chose not to renew his motion for summary judgment. His submission goes no farther than to argue that plaintiffs' motion for summary judgment should be denied, because factual issues remain as to the issues left open by the Third Circuit. A jury, argues Det. Sgt. Gregory, should decide whether Det. Sgt. Gregory was ordered to check the video by a superior officer (and therefore bears no responsibility for the continued detention), and whether a reasonable officer in Det. Sgt. Gregory's position would have checked the video footage earlier, during the initial 30-minute period of detention. (DE 151 at 3.)

## II.     THE ISSUES ON REMAND: GOVERNING LEGAL STANDARDS

Issues of qualified immunity are to be decided by applying a summary judgment standard to any disputed issues of fact upon which qualified immunity depends. If, after such analysis, material issues of fact remain, then those factual issues must be tried. *See Mawson v. Pittston Police Dep't*, 145 F. Supp. 3d 363, 372 (M.D. Pa. 2015) ("Should factual disputes that are material

7

to the qualified immunity analysis remain at the summary judgment stage, then Third Circuit precedent requires that the questions of fact go to a jury.") (collecting cases).[2] Now, on remand, Defendant Gregory concedes that relevant facts are in dispute, and he does not seek summary judgment in his favor. He argues only that the plaintiffs' motion for summary judgment must be denied, because, if those disputed factual issues were decided in Det. Sgt. Gregory's favor by a fact finder, he would be entitled to judgment, on substantive and particularly on qualified immunity grounds.

### A. Qualified Immunity

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). That two-part analysis inquires as to (1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679.

When evaluating the first prong, a court must consider the facts in the light most favorable to the plaintiffs. *Couden v. Duffy*, 446 F.3d 483, 492 (3d

---

[2] *See also Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (noting "the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right."); *Grant v. City of Pittsburgh,* 98 F.3d 116, 122 (3d Cir. 1996) (noting tension between the U.S. Supreme Court's "insistence that the immunity defense be decided as a matter of law" and "the reality. . . that factual issues must frequently be resolved in order to determine whether the defendant violated clearly established federal law"); *Castellani v. City of Atl. City*, No. 13-5848, 2017 WL 3112820, at *7 (D.N.J. July 21, 2017) ("Although the question of qualified immunity is generally a question of law, a genuine issue of material fact will preclude summary judgment on qualified immunity.") (cleaned up).

Cir. 2006). It must then apply the governing legal standards to those facts and decide whether a constitutional violation occurred. But even if there are factual issues precluding summary judgment as to the first, constitutional-violation prong, the Third Circuit requires that the district court decide the second prong, *i.e.,* whether the right at issue was clearly established at the time. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) ("[W]hile issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established.").

The second prong of qualified immunity asks whether the right at issue was so clearly established that the officer should have known that he or she was committing a constitutional violation under the circumstances. While courts are not to define clearly established law at too high a level of generality, *Thompson v. Howard,* 679 F. App'x 177, 182 (3d Cir. 2017), the precise factual circumstances of a given case need not have been previously considered. *Kelly v. Borough of Carlisle,* 622 F.3d 248, 259–60 (3d Cir. 2010) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances, as long as the law gave the defendant officer fair warning that his [or her] conduct was unconstitutional.") (cleaned up).

### B. Summary Judgment

As noted, in the current procedural posture, the court must apply a summary judgment standard to the issue of qualified immunity. Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of

9

establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### III. DISCUSSION

Currently, the only summary judgment movants are the plaintiffs, who, in order to prevail, must persuade the Court that the barrier of qualified immunity is overcome.

The Third Circuit's opinion leaves me with a two-step inquiry on remand. First, I must determine whether Det. Sgt. Gregory had the "requisite personal involvement" in the decision to delay the release of plaintiffs beyond the initial 30 minutes to permit review of the surveillance video. (3d Cir. Op. at 10.) Second, if I find Det. Sgt. Gregory did have the requisite personal involvement, I must determine whether a "reasonable officer with the information available to Gregory would have checked the video simultaneously with the questioning" in the initial 30-minute detention period. (*Id.*)

If there remains no genuine, disputed issue of material fact as to those two prongs, I may grant plaintiffs' motion for summary judgment as to the middle thirty minutes of the stop. I find, however, that there are disputed issues of fact, and I accept the defendant's position that those issues must be tried.

### A. Personal Involvement

As to whether Det. Sgt. Gregory had the requisite personal involvement in the decision to further detain the plaintiffs and check the surveillance video, the evidence is in conflict. A majority of the record evidence points to the conclusion that Det. Sgt. Gregory was in charge of the scene and had responsibility for making all important decisions. It is also true, however, that Det. Sgt. Gregory testified that he checked the video at the direction of DSFC Ciano, an officer who outranks him.

To some degree, then, the issue depends on whether a fact finder would be required to find that Det. Sgt. Gregory bears operational responsibility for the decision despite being outranked by Ciano. There is evidence from which a fact finder could draw that conclusion, but there is also evidence to the contrary. The plaintiffs are not entitled to summary judgment on this factual issue.

Det. Sgt. Gregory was in charge of the operation and gave the initial order to detain plaintiffs. Thus far, all the record evidence is in accord. In his deposition, moreover, Gregory testified that he was the lead investigator. (DE 117-5 at 32.) He also testified that he made the radio communication to other

officers, pointing out Summerville and Sirleaf and voicing suspicions that they were potentially involved with Parker (*id.* at 39), and that he ordered that the plaintiffs be detained initially (*id.* at 47). The testimony of other officers corroborates Det. Sgt. Gregory's testimony in this regard. Lieutenant Harrison, the highest-ranking officer on the scene (he outranks *both* Det. Sgt. Gregory and DSFC Ciano), confirmed that Gregory ordered the detention of plaintiffs without pausing to consult Lt. Harrison, and testified that Gregory "was calling the shots." (DE 117-5 at 114, 116.) Next, DSFC Ciano, who also outranks Det. Sgt. Gregory, testified that Gregory was responsible for the key decisions and that it was Gregory who made the decision to detain plaintiffs initially.³ (DE 117-6 at 5, 11.) DSFC Ciano testified that his own role was simply to "oversee the operation." (*Id.* at 5.) The bulk of the evidence establishes that Det. Sgt. Gregory was generally in charge of the scene and made the key operational decisions throughout plaintiffs' detention.

All of the foregoing suggests that Det. Sgt. Gregory, considerations of rank aside, directed the operation. There is also evidence to the contrary, however, which might support a finding that Det. Sgt. Gregory was not responsible for ordering the second 30-minute period of detention. Det. Sgt. Gregory's certification states "DSFC Peter Ciano directed myself and Trooper Joaquin to proceed to the Mall's security office to check any surveillance video that could confirm or further dispel any suspicion that Plaintiffs were involved with Parker." (DE 114-6 ¶ 19.) The Third Circuit found that this statement raised the possibility that Det. Sgt. Gregory may have simply been following DSFC Ciano's orders and therefore did not have the requisite "personal involvement" to be held liable. (3d Cir. Op. at 10.)

DSFC Ciano himself, however, gave limited support to Det. Sgt. Gregory's version of the events. In his deposition, DSFC Ciano testified that he "instructed" rather than "directed" Det. Sgt. Gregory to check the tape because

---

³   The testimony that Gregory was in charge was also corroborated by Det. Joaquin. (DE 117-7 at 6.)

12

in his experience the mall had a good surveillance system. (DE 117-6 at 11.) What is more, DSFC Ciano testified that he could not even remember which officers had checked the tape. (*Id.* at 12.) The question of whether DSFC Ciano ordered Det. Sgt. Gregory to check the video, or merely instructed Gregory as to the existence or potential usefulness of video evidence, is relevant. Orders or legal advice, particularly from a superior officer, can "support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 199 (3d Cir. 2005) (quoting *Bilida v. McCleod*, 211 F.3d 166, 174–75 (1st Cir. 2000)). Nevertheless if an officer "knew or should have known that their actions were violating the plaintiffs' constitutional rights, then they will not be allowed to hide behind the cloak of institutional loyalty." *Forsyth v. Kleindienst*, 599 F.2d 1203, 1217 (3d Cir. 1979).

  I therefore accept Det. Sgt. Gregory's position that his certification is sufficient to create a dispute of fact. It is possible that a jury could find that Det. Sgt. Gregory should not be held liable because he was relying in good faith on orders or instructions from a superior officer. It is also possible, however, that a jury could find that, regardless of the officers' formal ranks, Det. Sgt. Gregory had authority over the scene and made all relevant decisions, and that after consulting with Ciano, he made up his own mind whether to hold the plaintiffs while checking the surveillance tape. In addition, the jury could find that even if DSFC Ciano actually ordered Det. Sgt. Gregory to keep plaintiffs detained while checking the tape, Gregory should have known that doing so would violate the constitutional rights of suspects who had already been held for 30 minutes based on suspicions that had been entirely dispelled. These conclusions, however, require the jury to assess credibility and reach factual conclusions.

  Summary judgment for plaintiffs must therefore be denied.

### B. Reasonableness of Delay

As to the issue of whether Det. Sgt. Gregory could or should reasonably have arranged to check the surveillance video during the first 30-minute period, I likewise find that the evidence is in conflict, barring summary judgment in plaintiffs' favor.

As to an investigatory stop, "the 'reasonableness of the intrusion is the touchstone' of our analysis." *United States v. Torres*, 961 F.3d 618, 622 (3d Cir.), *cert. denied*, 141 S. Ct. 936 (2020) (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir. 1995)). A *Terry* stop "must be 'minimally intrusive' and tailored by police to 'diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]'" *United States v. Foster*, 891 F.3d 93, 106 (3d Cir. 2018) (alterations in original) (quoting *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985)).[4]

Because I deny plaintiffs' motion for summary judgment, the jury will be left to decide whether Det. Sgt. Gregory "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions," or, on the other hand, was "dilatory in [his] investigation," resulting in a "delay unnecessary to the legitimate investigation of the law enforcement officers." *Sharpe*, 470 U.S. at 686–87; *see also United States v. Scott*, 816 F. App'x 732, 738 (3d Cir. 2020). The factual dispute over the point at which Det. Sgt. Gregory learned (or reasonably should have known) of the existence of the surveillance system will be highly relevant to that inquiry. On that issue, the evidence pulls in both directions.

Both Summerville and Sirleaf testified in their depositions that soon after the officers started questioning them, the officers warned them not to lie because there was video of the encounter. (DE 117-4 at 17, 18, 54.) That

---

[4] Otherwise, the stop will be treated as having crossed the line to a warrantless arrest, which must be supported by probable cause and justified by some exception to the requirement of a warrant. *United States v. Edwards*, 53 F.3d 616, 620 (3d Cir. 1995) (noting that the length of time of a detention is one factor that distinguishes a *Terry* stop from a de facto arrest). Defendants make no attempt to justify the detention as an arrest.

testimony could support a finding that Det. Sgt. Gregory and other officers were aware from the very beginning that there was video surveillance in the mall parking lot. Now it could also be the case that the police were bluffing, but even a bluff suggests constructive knowledge sufficient to alert the police that they could check for video.[5] A jury could also potentially conclude that as a long-tenured detective, Det. Sgt. Gregory should have been aware that it was highly likely that the mall had a surveillance system covering the parking lot. There were many officers on the scene, and two peaceful, handcuffed suspects did not require much monitoring; it would have been easy to dispatch one of them to check on the videotape. A jury could find that Det. Sgt. Gregory was or should have been aware of the surveillance tape well before the 30-minute mark. If so, the jury could find that Det. Sgt. Gregory was dilatory and that it was unreasonable for him to string out the detention by pursuing investigative leads one at a time.

Such evidence does not, however, *compel* summary judgment for plaintiffs. Both Det. Sgt. Gregory and DSFC Ciano testified that they did not at first hit upon the idea of reviewing the surveillance video. It was only after Parker had been stopped and the heroin discovered in his car by officers including DSFC Ciano, they said, that they discussed video surveillance. (DE 117-6 at 11; DE 114-6 ¶ 19.) The record evidence does not establish with any clarity how long it took to stop Parker and search his car, although testimony might shed further light on the issue. Nevertheless, if the jury concluded that Det. Sgt. Gregory should not be charged with actual or constructive knowledge of the video surveillance until DSFC Ciano told him about it, it could find that Det. Sgt. Gregory was not unreasonable in having failed to dispatch an officer to check the surveillance tape earlier.

---

5    In the court's experience, police officers commonly do so in cases where the crime scene is a retail establishment.

Because there is a dispute of material fact as to how early Det. Sgt. Gregory could or should have set in motion a review of the videotape surveillance, I must deny summary judgment on that question.

### C. Whether any constitutional violation was "clearly established"

As noted above, even where factual issues preclude the court from finding that a constitutional violation occurred, Third Circuit precedent requires it to facilitate appellate review by ruling in the alternative as to whether any such violation would have violated clearly established standards.

It is clearly established that in the context of a *Terry* stop, police officers must pursue diligently "a means of investigation that was likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. 686. It is similarly apparent that the officers were required to release the plaintiffs fairly promptly once the suspicion giving rise to the stop (here, participation in a drug deal) was dispelled. *See Illinois v. Caballes*, 543 U.S. 405 (2005) (a reasonable-suspicion traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a traffic ticket); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (the seizure remains lawful and the officers may question the car's occupants, but only "so long as [unrelated] inquiries do not measurably extend the duration of the stop.").[6]

Det. Sgt. Gregory has not articulated much of a justification for continuing to hold the plaintiffs beyond the first thirty minutes, aside from a

---

[6]    Cases such as *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and *United States v. Clark*, 902 F.3d 404 (3d Cir. 2018), even more firmly underscore the principle that a reasonable-suspicion traffic stop cannot extend beyond the time required to fulfill its purpose, *i.e.,* to issue a ticket for a traffic violation, unless further evidence emerges. Those cases were decided after the October 2014 detention at issue in this case, however, so I do not rely on them for qualified immunity purposes. I note, however, that they represent a refinement, in the traffic-stop context, of a principle already well-established in the case law, *i.e.,* that the reasonableness of the scope of a detention is measured by its legitimate purpose. *See, e.g., Rodriguez,* 135 S. Ct. at 1614 (citing, *e.g., Caballes* and *Johnson, supra* in text.) Indeed, *Terry* itself required that the manner of execution of the stop be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19–20).

desire to conduct further investigation. The case law clearly requires that officers act with dispatch to confirm or dispel the suspicions that gave rise to the stop. If, at trial, the jury finds that Det. Sgt. Gregory was or should have been aware of the video and was dilatory in assigning an officer to review the video, then the jury would be entitled to find that he violated clearly established law and was not entitled to qualified immunity for the second, 30 minute period of detention.

## IV. CONCLUSION

For the reasons stated in this Opinion, I will deny plaintiffs' motion for summary judgment (DE 117).

Dated: April 7, 2022

/s/ Kevin McNulty

**HON. KEVIN MCNULTY, U.S.D.J.**